**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

| | |
|---|---|
| Eric A. Cohen, | |
| **Plaintiff,** | |
| **v.** | Case No. _____ |
| Power Solutions International, Inc., | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## PRELIMINARY STATEMENT

1.      Plaintiff Eric A. Cohen, through undersigned counsel, brings this action pursuant to the whistleblower protections under the Sarbanes-Oxley Act ("SOX"), the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), and the Illinois Whistleblower Act, as well as Illinois common law, to remedy acts of retaliation and harassment perpetrated against him by his former employer, Power Solutions International, Inc. ("PSI" or the "Company").

2.      Plaintiff alleges that PSI's retaliation and harassment was in direct response to his reports of Company violations of U.S. Generally Accepted Accounting Principles ("GAAP"), SOX, and federal securities laws and rules prohibiting securities and accounting fraud.

3.      In early 2016, Mr. Cohen, as PSI's then-Chief Operating Officer ("COO"), furnished these reports to PSI personnel with supervisory authority over him, including to then-Chief Executive Officer ("CEO"), Chairman, President, and primary shareholder, Gary Winemaster ("Winemaster"); Chief Legal Counsel and Vice President of Human Resources William Buzogany ("Buzogany"); PSI's Board of Directors (the "Board"); PSI's Audit

Committee (the "Audit Committee"); and other senior PSI executives and employees. These reports constitute protected whistleblowing activity under SOX, Dodd-Frank, and Illinois law.

4. Plaintiff asserts that, after he raised these concerns, Company management—spearheaded by Winemaster and Buzogany—created a hostile work environment by threatening Mr. Cohen with termination, attempting to suppress Mr. Cohen's protected whistleblowing activity, and pressuring him to participate in the fraudulent activity he had reported.

5. Mr. Cohen then reported his concerns to the Board and Audit Committee on April 28, 2016. These reports likewise constituted protected whistleblowing activity under SOX, Dodd-Frank, and Illinois law. Immediately thereafter, PSI officers and agents threatened to terminate Cohen via a specious "Action Plan," which purported to set out "performance-related" issues. This "Action Plan" had no basis in fact, and comprised the first complaints about Mr. Cohen's performance—formal or informal—during his entire tenure at PSI up until that point.

6. Nevertheless, on May 5, 2016, Mr. Cohen provided a point-by-point letter response, supported by specific documentary evidence that refuted each of the Board's purported complaints about Mr. Cohen's job performance. This May 5 letter again advised the Board that PSI was engaging in a wide range of unlawful practices, including channel-stuffing.

7. After receiving no reply to his May 5 letter, Mr. Cohen emailed the Board on May 12, 2016, requesting a substantive response, and on May 13, 2016, he presented Buzogany with a draft letter to PSI's Board, describing "details and documents supporting more than a dozen instances" of "unethical and unlawful activities engaged in at PSI[.]"

8. Buzogany urged Mr. Cohen not to present his May 13 letter to the Board, but instead, to discuss these issues with Winemaster. On May 13, 2016, the Company finally replied

in the form of a letter from Buzogany which failed to substantively respond to Mr. Cohen's May 5 letter and generically directed him to comply with the Board's pretextual Action Plan.

9.     Then, on May 16, 2016, Mr. Cohen was terminated by PSI, after he continued to report concerns that were protected under SOX, Dodd-Frank, and Illinois law.  Following his termination, the Company made numerous false and defamatory statements, claiming Mr. Cohen had "resigned" and insinuating he was an ineffective COO.

10.     Defendant PSI's unlawful discharge and harassment violated SOX, Dodd-Frank, and Illinois statute and common law, because it retaliated against Mr. Cohen in the terms and conditions of his employment.  PSI also breached various employment, bonus, and stock appreciation right ("SAR") agreements by terminating Mr. Cohen without "Cause" and failing to provide him the rights, benefits, and payments to which he is entitled under those contracts.

11.     PSI's unlawful retaliation has caused significant damage to Mr. Cohen personally, professionally and financially.  Despite his stellar academic and professional credentials, having actively fought against wrongdoing at PSI, and receiving superb performance reviews during his four-year tenure as COO, Mr. Cohen has struggled to clear his name due to his association with PSI and its illegal conduct and harassment, resulting in significant pain and suffering, emotional distress, and reputational and professional damage.  Moreover, in addition to the damage caused by PSI's retaliation and harassment, PSI's breach of multiple agreements has quantifiably damaged Mr. Cohen in excess of $8 million.

## JURISDICTION AND VENUE

12.     This Court has original federal question jurisdiction pursuant to 15 U.S.C. § 78u-6(h)(1)(B)(i), 15 U.S.C. § 78aa(a), and 28 U.S.C. § 1331, because Plaintiff's federal statutory retaliation claims arise under SOX and Dodd-Frank, laws of the United States.

13.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because Plaintiff's Illinois Whistleblower Act and Illinois common law claims are related to, and form the same case or controversy as, Plaintiff's federal claims.

14.     Venue is proper in the Eastern Division of the Northern District of Illinois pursuant to 15 U.S.C. § 78aa(a) and 28 U.S.C. §§ 1391(b)-(c), because PSI resides and transacts business in, and a substantial part of the events or omissions giving rise to the claims occurred in, DuPage County, Illinois.

## PARTIES AND RELEVANT NON-PARTIES

15.     Plaintiff Eric A. Cohen is a citizen of the State of Illinois residing in Cook County.  He was an employee of PSI from about April 2012 until his illegal termination on or about May 16, 2016.

16.     Defendant PSI is a publicly-traded[1] Delaware corporation with its principal office located at 201 Mittel Drive, Wood Dale, Illinois  60191.  PSI designs, manufactures, and distributes power systems and related equipment in various markets, including for use in commercial and industrial vehicles.  Though PSI is currently delinquent in its periodic filing obligations with the U.S. Securities and Exchange Commission ("SEC"), it has a class of securities registered under section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), and it files reports with the SEC required under sections 13 and 15(d) of the Exchange Act.

17.     Power Great Lakes, Inc. ("PGL") is an Illinois corporation with its principal office located at 655 Wheat Lane, Wood Dale, Illinois  60191.  PGL is a wholly-owned subsidiary of PSI.  PGL is one of the largest distributors of Perkins engines in North America

---

[1] PSI was formerly listed on the NASDAQ stock exchange under ticker symbol "PSIX."  On April 19, 2017, PSI announced that NASDAQ had delisted PSIX from trading.  Presently, PSI trades over the counter.

and one of the largest in the world. PGL customizes Perkins base engines to develop custom power solutions for industrial equipment manufacturers.

18. Professional Power Products, Inc. ("3Pi") is an Illinois corporation with its principal office located at 447 West Madison Street, Darien, Wisconsin 53114. 3Pi became a wholly-owned subsidiary of PSI in 2014. 3Pi is a designer and manufacturer of large, custom engineered, integrated electrical power generation systems serving the global diesel and natural gas power generation market.

19. Until recently, and during all times Mr. Cohen was employed by PSI, Gary Winemaster was PSI's President, CEO, and Chairman of PSI's Board. Gary Winemaster recently resigned from the Board and as CEO in April 2017. Also until recently, Gary Winemaster, with his brother, PSI Senior Vice President Kenneth Winemaster, owned over 56% of PSI's outstanding stock.

20. William Buzogany is PSI's Chief Legal Counsel and Vice President of Human Resources. Buzogany has been Mr. Cohen's point of contact at the Company regarding his discharge. On information and belief, Mr. Buzogany was aware of and/or an active participant in the fraudulent activity and other malfeasance at the Company under the direction of Winemaster.

21. Kenneth Winemaster is Gary Winemaster's brother and serves as PSI's Senior Vice President. Together, Gary and Kenneth Winemaster are the majority shareholders of PSI. On information and belief, Kenneth Winemaster was aware of and/or an active participant in the fraudulent activity and other malfeasance at the Company under the direction of Gary Winemaster.

22. Michael Lewis was PSI's former Chief Financial Officer. On information and belief, Mr. Lewis was aware of and/or an active participant in the fraudulent activity and other

malfeasance at the Company under the direction of Winemaster. On February 1, 2017, Mr. Lewis took a leave of absence and tendered his resignation from PSI, after the Company's outside auditor announced it could no longer rely on the Company's representations.

23.     Dino Xykis is PSI's Vice President of Engineering. On information and belief, Mr. Xykis was aware of and/or an active participant in the fraudulent activity and other malfeasance at the Company under the direction of Winemaster.

24.     Craig Davis is PSI's Vice President of Sales. On information and belief, Mr. Davis was aware of and/or an active participant in the fraudulent activity and other malfeasance at the Company under the direction of Winemaster.

25.     Jim Needham is PSI's Manager of Oil and Gas. On information and belief, Mr. Needham was aware of and/or an active participant in the fraudulent activity and other malfeasance at the Company under the direction of Winemaster.

26.     Kenneth Landini has served as Director on PSI's Board since 2001, and currently is PSI's Board's "Lead Outside Director." Mr. Landini previously served as Chairman of PSI's Audit Committee during 2012 and 2013. Mr. Landini was present for Mr. Cohen's April 28, 2016 Board presentation regarding the fraudulent activity and other malfeasance taking place at the Company and, on information and belief, ignored and disregarded these reports.

27.     Until recently, and during all times Mr. Cohen was employed by PSI, Ellen R. Hoffing served as Director on PSI's Board and Member of the Audit Committee since September 2015. Ms. Hoffing was present for Mr. Cohen's April 28, 2016 Board presentation regarding the fraudulent activity and other malfeasance taking place at the Company and, on information and belief, ignored and disregarded these reports.

28.     Until recently, and during all times Mr. Cohen was employed by PSI, Jay J. Hansen served as Director on PSI's Board since 2011, Member of the Audit Committee since its formation in January 2012, and Chairman of the Audit Committee since mid-2013. Mr. Hansen was present for Mr. Cohen's April 28, 2016 Board presentation regarding the fraudulent activity and other malfeasance taking place at the Company and, on information and belief, ignored and disregarded these reports.

29.     Until recently, and during all times Mr. Cohen was employed by PSI, Mary E. Vogt served as Director on PSI's Board since 2011 and Member of the Audit Committee since its formation in January 2012. Ms. Vogt was present for Mr. Cohen's April 28, 2016 Board presentation regarding the fraudulent activity and other malfeasance taking place at the Company and, on information and belief, ignored and disregarded these reports.

## STATEMENT OF FACTS

## I.     WINEMASTER'S CONTROLLING ROLE WITHIN PSI

30.     On information and belief, since inception, PSI and its predecessors were owned and operated by the Winemaster family and, in April 2011, PSI launched as a public company through a reverse merger transaction. Until very recently, the Company has remained in the exclusive control of the Winemaster family, with Gary and Kenneth Winemaster controlling roughly 56% of PSI's outstanding common stock.

31.     During the relevant timeframe, Winemaster exercised an exceptional amount of control over PSI's operations, including directing the Company's sales force (many of whom reported directly to him) and handling communications with many PSI clients. The message throughout PSI was clear—sales operations were owned and controlled by Winemaster—and if anyone circumvented him, even executives like Mr. Cohen, their job was on the line.

32. During the relevant timeframe, Winemaster also controlled Company matters requiring stockholder approval, including the election of directors, amendment of articles of incorporation, and approval of significant corporate transactions. Winemaster also effectively controlled the operations of PSI's Board, many of whom were Winemaster's close friends from high school, family friends, or other personal connections.

33. PSI and Winemaster repeatedly assured stockholders that the Company's internal controls and procedures were effective and sufficient. Behind the scenes, however, Winemaster was engaged in a consistent practice of accounting fraud and financial malfeasance.

## II. PSI'S RECRUITMENT OF MR. COHEN AND HIS COMMENCEMENT OF EMPLOYMENT WITH THE COMPANY

### A. PSI Specifically Recruited Mr. Cohen as Its COO.

34. Mr. Cohen possesses a stellar academic and professional background. In 1991, he earned a mechanical engineering degree from the University of Wisconsin, and then completed General Electric's competitive two-year management training program, where he began his career. Thereafter, Mr. Cohen attended Harvard Business School, receiving an M.B.A. in 1997. He then held a number of executive leadership positions in industrial technology companies, including as CEO of Ampere Automotive, General Manager of Midwest Air Technologies, and President of Power Plant Services.

35. In April 2012, Mr. Cohen was hired as PSI's COO, after Winemaster specifically recruited him for this role. In the press release announcing Mr. Cohen's hire, Winemaster stated: "We . . . look forward to utilizing [Cohen's] operational and acquisitions experience to manage

our rapid growth." PSI also boasted that Mr. Cohen "has deep manufacturing and management experience with firms that design and manufacture engines and turbines."[2]

> **B. PSI Induced Mr. Cohen to Enter into Employment, SAR, and Bonus Agreements Based on Fraudulent Misrepresentations Regarding the Company.**

36. **Employment Agreement.** Around June 6, 2012, Mr. Cohen signed an Executive Employment Agreement ("Employment Agreement") to serve as COO of PSI and PGL.

37. The Employment Agreement provides that, if Mr. Cohen was terminated for a reason other than "Cause," he would be entitled to certain "Severance Benefits," including his "Base Salary" for 12 months and an amount equal to the "Annual Bonus" he earned in the year preceding the year of termination, prorated for the number of days he had worked that year.

38. **SAR Agreement.** As part of Mr. Cohen's Employment Agreement, he also entered into a Stock Appreciation Rights Agreement ("SAR Agreement"). Pursuant to the SAR Agreement, Mr. Cohen was granted a total of 543,872 SARs that would vest on subsequent anniversaries of employment as follows: (i) 181,291 SARs would vest on June 6, 2013; (ii) 181,291 SARs would vest on June 6, 2014; and (iii) 181,290 SARs would vest on June 6, 2015.

39. **SAR Agreement Amendments and Bonus Agreement**. In early June 2015, on the eve of Mr. Cohen's last tranche of SARs vesting, Winemaster made a heartfelt pitch to Mr. Cohen to induce him to delay vesting in his final tranche of SARs and remain at PSI by making a series of misrepresentations regarding the Company's health and trajectory, as well as Mr. Cohen's growth potential within the Company. And, in exchange for delaying the vesting of his SARs, Winemaster promised Mr. Cohen additional guaranteed bonus payments for the years 2016-2019.

---

[2] https://www.sec.gov/Archives/edgar/data/1137091/000119312512162793/d335036dex991.htm

40. During this period, Winemaster also made a series of knowingly misleading and inaccurate reports to shareholders regarding the Company's health and performance. For instance, on a May 7, 2015 earnings call, he boasted that PSI's "strong execution" and "confidence in our outlook for 2015" resulted in 2016 revenue being raised to "the range of $630 million to $670 million."[3] At the time he made these—and other—statements, Winemaster was aware of, and actively engaging in, a number of fraudulent sales intended to inflate PSI's purported health and revenue figures.

41. Winemaster's representations turned out to be false. Within the year, Mr. Cohen had learned the truth about PSI's dire financial straits and its endemic fraud, Mr. Cohen was abruptly forced out of the Company, and Mr. Cohen received none of the promised additional bonus payments.

42. At the time, however, Mr. Cohen did not know of these falsehoods and relied on Winemaster's misrepresentations in signing three agreements: the First Amendment to SAR Agreement dated June 5, 2015; the Second Amendment to SAR Agreement dated June 17, 2015; and the SAR and Bonus Agreement dated July 6, 2015 ("Bonus Agreement").

43. Notably, Section 1 of the Bonus Agreement amends the SAR Agreement to provide that any unvested SAR becomes immediately fully vested and exercisable if Mr. Cohen is terminated for a reason other than "Cause," and that Mr. Cohen will have 30 days from the date of such termination to exercise the unvested SARs.

44. Section 2 of the Bonus Agreement provides that Mr. Cohen will be paid an annual bonus of $250,000 for each of the calendar years 2016-2019, so long as he remained employed by the Company through the end of the respective calendar year. It also provides that if Mr.

---

[3] *See* https://seekingalpha.com/article/3157856-power-solutions-internationals-psix-ceo-gary-winemaster-on-q1-2015-results-earnings-call-transcript?part=single

Cohen was terminated for a reason other than "Cause," he is entitled to receive, within 45 days of his termination, the $250,000 bonus for the calendar year in which he was terminated.

### C. PSI Executives and Employees Are Governed by Codes of Ethics.

45.     Upon request of the Company's auditors, PSI principals and senior financial officers (including Winemaster and Mr. Cohen) were required to certify annually that they have reviewed and agree to abide by PSI's Code of Ethics for Principal and Senior Financial Officers ("Code of Ethics").[4]  The Code of Ethics provides, *inter alia*, that PSI's senior officers must:

- Exhibit and promote honest and ethical conduct;
- Ensure transactions are properly authorized and accurately and timely recorded using GAAP;
- Not make false or artificial statements in the Company's books, records, financial statements or related communications;
- Submit "full, fair, accurate, timely and understandable disclosures" in all filings with the SEC and other public communications; and
- Establish mechanisms to monitor compliance with applicable governmental laws, rules and regulations and promptly bring incidents of suspected non-compliance to the attention of the Audit Committee.

46.     If senior officers fail to follow these obligations, the Code of Ethics makes clear: "In the event of a violation by a Senior Officer of this Code, the Audit Committee shall be responsible for recommending appropriate disciplinary and/or remedial actions."[5]

47.     PSI also enacted a separate Code of Business Conduct and Ethics ("Business Conduct Code") requiring Company personnel to "observe the highest standards of ethics in the conduct of the Company's business, avoiding even the appearance of impropriety, and conduct themselves with the highest regard and respect for others," as well as an additional provision affirmatively barring retaliation for protected whistleblowing activity.[6]

---

[4] *See* http://www.psiengines.com/investor-relations/corporate-governance/code-of-ethics-for-principal-and-senior-financial-officers.
[5] *Id.*
[6] *See* http://www.psiengines.com/forms/PSI-Code_of_Business_Conduct_and_Ethics.pdf.

48.     On information and belief, Winemaster, Buzogany, Kenneth Winemaster, CFO Lewis, and others signed the Code of Ethics and the Business Conduct Code, as did Mr. Cohen.

49.     In each of PSI's annual and quarterly reports filed with the SEC during Mr. Cohen's employment, Winemaster and PSI's CFO certified pursuant to SOX § 302(a), 15 U.S.C. § 7241(a) that:  (i) financial information contained therein was accurate and complete; (ii) they had established and maintained adequate internal controls for public disclosure; and (iii) they had disclosed to PSI's external auditor and Audit Committee any fraud, whether or not material, involving management or other employees having a significant role in PSI's internal controls.

**D.     Mr. Cohen Served as a Model COO and Was in Line to Replace Winemaster.**

50.     During his tenure as COO, Mr. Cohen received uniformly stellar performance reviews, as well as pay increases based on his performance.  Winemaster also regularly praised Mr. Cohen's performance throughout his employment at PSI.

51.     In fact, Mr. Cohen was told on multiple occasions—by multiple PSI senior executives—that he was being groomed as the Company's next CEO to replace Winemaster. Winemaster himself had several such conversations with Mr. Cohen, making it common knowledge at PSI that Mr. Cohen would be his successor and the next CEO.  Buzogany and Kenneth Winemaster likewise had numerous conversations with Mr. Cohen discussing his succession to PSI's CEO.

**III.    MR. COHEN DISCOVERS THAT WINEMASTER AND HIS COHORTS ARE ENGAGED IN WIDESPREAD FRAUD AND OTHER MALFEASANCE**

**A.     Mr. Cohen Discovers Sham Transactions, Channel-Stuffing, and Pull-Forward Sales to Fictitiously Inflate PSI's Recognized Revenue.**

52.     As COO, Mr. Cohen's purview into PSI's financial situation and client interaction was limited, as he was not in the Company's sales or financial chain of command.  Unlike at

most companies, PSI sales personnel reported directly to Winemaster and had no substantive reporting relationship to Mr. Cohen, who had not even met many of PSI's large customers.

53.    However, in Q1 2016, Mr. Cohen became suspicious of PSI's financial dealings after he was informed that the Company—whose 2015 reported revenue approached $400 million, and whose stock price spiked over 70% from February 10, 2016 (the day after PSI reported Q4 2015 results) to June 30, 2016—was experiencing a cash shortage and dramatic revenue fluctuations.

54.    Deeply concerned by this news, Mr. Cohen began an independent investigation, and he soon discovered that the cash crunch and revenue fluctuations were due in large part to the Company incurring substantial costs on products that were not being manufactured for legitimate business purposes.  Instead, PSI was expending significant financial resources manufacturing units as part of sham transactions in order to fraudulently inflate revenue and sales figures, thus misleading PSI's auditors, investors, regulators, analysts, and employees.  The units from these sham transactions would either go unsold or be subject to sales terms that would generate little-to-no margin, or potentially even a loss.

55.    Further, even when units from the sham transactions actually were sold to actual counterparties, this would have the deleterious effect on future years' earnings of "stuffing the channel" to PSI's customers, reducing customers' sales demand going forward.  Mr. Cohen realized that this channel stuffing and the related "pulling forward" of future years' sales was not being disclosed in any of the Company's public filings with the SEC or other disclosures, and that the Company was claiming recognized revenue in its books and records from these sham sales.

56.     On information and belief, PSI needed this sham revenue to hit quarter-end revenue targets, which were created and communicated by Winemaster, and expected by investors and Wall Street analysts, or else the Company would risk that its stock price would drop precipitously.  Such a drop would be particularly devastating to the Winemasters, who held the largest position in PSI stock and had clear motives to keep the stock price as high as possible at all costs.

57.     In particular, Mr. Cohen uncovered the following sham transactions, which, on information and belief, are just the tip of the iceberg.

**1.     PSI Improperly Recognized $2.98M in Revenue on a Sham Transaction Involving Unwanted Units That Were Not Delivered to a Customer and Sat Idle in 3Pi's Parking Lot.**

58.     Mr. Cohen uncovered a sham transaction from Q4 2015, where Winemaster directed PSI subsidiary 3Pi to manufacture three custom-built industrial generators (built to Winemaster's, not a customer's, specifications).  These units purportedly were to be sold to a customer named Mesa Natural Gas Solutions, LLC ("Mesa") at a price of $995,000 per unit.

59.     Winemaster, through PSI's Manager of Oil and Gas Needham, told 3Pi CFO Mick Anderson that the Company would produce a purchase order relating to this sale, because PSI and 3Pi needed the revenue to make the end of quarter numbers.  However, this supposed purchase order, dated December 29, 2015, contained no payment terms, and Mesa did not take delivery of the units.  Instead, the units sat idle in 3Pi's parking lot.

60.     Mr. Cohen also learned that Winemaster had no customer lined up when he ordered these units built to his specifications, and when no customer emerged, he engineered the bogus Mesa transaction.  On information and belief, Mesa never wanted these units and never paid PSI for them, which were still at 3Pi when Mr. Cohen was terminated in May 2016.

14

61.     On information and belief, PSI reported $2.98 million as recognized revenue on the sham Mesa transaction, which Winemaster orchestrated at the end of Q4 2015 in order to meet revenue and sales projections for the fiscal year 2015.

62.     Mr. Cohen initially reported his concerns regarding the adverse impact of pull-forward sales on PSI's operations to a number of individuals within PSI, including Buzogany, Winemaster, VP of Sales Davis, Oil and Gas Manager Needham, and CFO Lewis.  These individuals ignored his reports and discouraged Cohen from investigating further.   Cohen later included these reports in his April 2016 Board and Audit Committee presentations, as well as in subsequent reports to Winemaster, Buzogany, and the Board that specifically referenced channel-stuffing, fraud, and other malfeasance.

> **2.     Similarly, PSI Improperly Recognized $750,000 in Revenue on Another Sham Transaction Involving More Unwanted Units That Sat Idle in a Warehouse Rented and Paid for by PSI.**

63.     Mr. Cohen uncovered another sham transaction dated December 31, 2015, whereby another customer, Green APU, LLC ("Green APU"), purportedly was sold 250 engines for a total of roughly $750,000.   On information and belief, after the units already were manufactured, Winemaster identified Green APU as a potential purchaser in late December 2015.

64.     However, Green APU had a terrible payment history with PSI—as of the morning of December 31, 2015, Green APU was subject to a PSI credit hold, preventing it from placing any new PSI orders.  Thus, to book the sale before the end of Q4 2015, Winemaster ordered PSI staff to remove the credit hold and generate a purchase order dated December 31, 2015.

65. Once again, similar to the sham Mesa deal, the customer did not take delivery of the units. Instead, Winemaster directed these units to be sent to an offsite warehouse space acquired and paid for by PSI at a cost of $400 per month.

66. Mr. Cohen discovered that the units were not wanted by Green APU, or any other customer, but that Winemaster had ordered them to be manufactured in order to book the sale. In fact, on information and belief, Green APU was not even aware of the transaction at the supposed time of purchase (and PSI employees were instructed not to tell Green APU or anyone else).

67. Mr. Cohen initially reported his concerns regarding the adverse impact of pull-forward sales on PSI's operations to a number of individuals within PSI, including Buzogany, Winemaster, VP of Sales Davis, and CFO Lewis. These individuals ignored his reports and discouraged Cohen from investigating further. Cohen later included these reports in his April 2016 Board and Audit Committee presentations, as well as in subsequent reports to Winemaster, Buzogany, and the Board that specifically referenced channel-stuffing, fraud, and other malfeasance.

### 3. PSI Improperly Recognized $11.3M in Revenue Through Illicit Side Agreements and Classic "Round-Tripping" Financial Fraud.

68. Mr. Cohen's investigation uncovered yet another series of fraudulent transactions in Q2 and Q3 2015 with yet another PSI customer, Moser Energy Systems ("Moser"), one of PSI's largest and longest-standing customers. There, PSI knowingly and purposely inflated the book value of purchases in order to meet the Company's sales and revenue projections.

69. First, Cohen learned that in June 2015, Winemaster directed Needham to have Moser submit purchase orders in advance of its normal needs, in exchange for $10 million of PSI 21.9L units with essentially open payment terms. On information and belief, this agreement was

16

memorialized in a secret PSI-Moser side-letter containing "forever payment terms" whereby Moser was under no obligation to make any payments to PSI at any particular time, and Moser had no legitimate need for these units.

70.     On information and belief, this transaction was significant, because it resulted in PSI's Q2 2015 total revenue of $95 million being inflated by 12%, whereas the quarter would otherwise have likely reported a net loss, not profit.  This $10 million of improper revenue had a gross profit contribution of roughly $3.5 million on Q2 2015's total net income of $2.2 million.

71.     On further information and belief, the fraudulent June 2015 deal was part of a broader roundtrip transaction whereby Moser agreed to purchase the PSI engines worth $10 million (with open or "forever" payment terms); in exchange, in a November 2016 transaction with a paper value of $9.6 million, PSI later agreed to buy back from Moser sixty generators that contained the exact same 21.9L engines that PSI had sold to Moser in June 2015.  Winemaster orchestrated this arrangement and instructed PSI's Oil and Gas Manager Needham and VP of Advanced Products Don Wilkins to carry it out.

72.     On information and belief, PSI had no use for Moser's generators, nor does PSI sell generators.  Also on information and belief, these Moser generators are still sitting in PSI's parking lots in Itasca, IL at the time of this filing.  Based on the allegations of a recently-filed lawsuit by Moser, *Moser Engine Service, Inc. v. Power Solutions International*, No. 1:17-cv-04258 (N.D. Ill.), PSI has not paid Moser more than an initial down payment in support of this fraudulent deal.

73.     At no point has the Company publicly disclosed this fraudulent Q2 2015 transaction, nor the related side-letter, nor the roundtrip deal, and the Company listed the full $10 million amount for this Moser transaction as recognized revenue in its books.

74.     Next, Cohen uncovered that in Q3 2015, Winemaster engineered another secret arrangement with Moser, whereby Moser would be invoiced and receive approximately $4.3 million of PSI units, but under a secret side agreement, would only pay PSI approximately $3 million.

75.     On information and belief, however, PSI's billing department was not made aware of Winemaster's arrangement, causing it to issue Moser a billing invoice in the full book amount of $4.3 million. Moser, confused upon receiving an invoice for the full book value rather than the discounted amount Winemaster had secretly promised, contacted PSI sales representatives regarding the amount it actually owed.

76.     The issue was brought to the attention of then-CFO Lewis, who escalated it to Winemaster. Winemaster and Lewis then engineered another covert arrangement, whereby Moser was issued a separate, off-book credit for the difference between the book value and the agreed value ($1.3 million), and PSI applied that credit against the same transaction.

77.     PSI never disclosed the $1.3 million side agreement, and it listed the full $4.3 million paper value for this Q3 2015 Moser transaction as recognized revenue in its books.

78.     Mr. Cohen initially reported his concerns regarding the adverse impact pull-forward sales on PSI's operations to a number of individuals within PSI, including Buzogany, Winemaster, VP of Sales Davis, Oil and Gas Manager Needham, and CFO Lewis. These individuals ignored his reports and discouraged Cohen from investigating further. Cohen later included these reports in his April 2016 Board and Audit Committee presentations, as well as in subsequent reports to Winemaster, Buzogany, and the Board that specifically referenced channel-stuffing, fraud and other malfeasance.

**B. Cohen Also Uncovers Other Widespread Fraud and Wrongdoing at PSI.**

79.     Shocked and dismayed, Mr. Cohen continued his investigation and uncovered many additional instances of fraud and other malfeasance occurring at Winemaster's direction or with his knowledge or consent.  These include PSI misleading its auditors and filing a falsified white paper[7] inflating the value of subsidiary 3Pi's acquired goodwill (claiming goodwill of $23 million when 3Pi lost $8 million in prior year), and PSI fraudulently grossly inflating its research and development tax credits on its federal tax filings by fabricating documents and presenting fictitious meetings to government auditors (resulting in $2.4 million in inflated tax credits in 2015 tax filings).

80.     Mr. Cohen communicated these concerns in his reports to Winemaster, Buzogany, and the Board that specifically referenced tax and accounting fraud, and other malfeasance.

**C. PSI Doubles Down on its Fraudulent Schemes by Misrepresenting the Company's Revenue and Overall Health in Public Releases and as a Basis to Secure Massive Loans Needed to Keep the Company Afloat.**

81.     Not only did PSI defraud investors, analysts, employees, auditors, and others in perpetrating these schemes in the first instance, the Company touted these knowingly false figures privately and publicly to further exploit the endemic fraud at PSI.

82.     For instance, PSI claimed in a February 2016 press release that its "performance in 2015… [provides] a sound basis to move forward," due to that period's "record high in sales."[8]  PSI had previously claimed in its annual report to the SEC for 2015 that "[o]ur net sales increased $41,451,000 (11.9%) to $389,446,000 in the year ended December 31, 2015 compared to $347,995,000 for the same period of 2014," and that "[a]ccounts receivable, net increased

---

[7]  On information and belief, the fictitious 3Pi white paper is still on file with PSI and its former auditor, RSM.

[8]  *See* http://investors.psiengines.com/releasedetail.cfm?ReleaseID=956232

$22,625,000 year over year as a result of the increase in sales we have experienced and timing of payments." However, Winemaster and others in the Company knew that these 2015 numbers were illegitimate in the first place and provided no sustainable basis for going forward growth.

83. More egregiously, the Company doubled down on its malfeasance and secured $135 million in loans from two banks based on the fraudulently inflated revenue and sales figures and the fundamentally false depiction of PSI's overall health. On June 29, 2016, the Company announced that it had closed on a $135 million "senior secured credit facility" comprised of loans from TPG Specialty Lending and Wells Fargo Bank that were obtained based on these spurious 2015 revenue figures and 2016 projections.[9]

84. During recent company meetings, senior PSI executives admitted that this debt deal would not be possible if the company furnished accurate revenue numbers and financial projections, and that without this deal the Company would be "out of money."

85. In particular, during a May 6, 2016 meeting to prepare for an upcoming earnings call, CFO Lewis admitted to the group (including Mr. Cohen, VP of Finance Joe Kania, Director of Investor Relations Gary Dvorchak, and others) that PSI could not legitimately meet 2016 projected revenue guidance of $360 million; instead, using legitimate accounting methods, PSI's projected revenue for 2016 was only $310 million. Mr. Lewis exclaimed that unless the Company could find a way to artificially inflate PSI's 2016 revenue figures to at least $330 million, it "will f*** the debt deal" that PSI desperately needed to stay afloat.

86. On information and belief, TPG Specialty Lending and Wells Fargo Bank would not have financed PSI's $135 million debt package had they received accurate 2016 revenue projections. Also on information and belief, had PSI not received the $135 million debt package,

---

[9] *See* http://investors.psiengines.com/releasedetail.cfm?ReleaseID=977671

the Company shortly would have been unable to continue operations due in large part to the cash shortage caused by Winemaster's and others' fraud and malfeasance.

87.     In fact, on information and belief, in order to obtain approval for this funding, PSI knowingly failed to disclose Mr. Cohen's retaliation and other claims (of which PSI was aware at least as of May 2016) in Schedule 4.6 of the loan agreement, which required PSI to list all actions or threatened actions that may result in liabilities in excess of $500,000.

## IV.    MR. COHEN BLOWS THE WHISTLE ON THE NEWLY-DISCOVERED FRAUD AND IS QUICKLY DISCHARGED IN RETALIATION

### A.    Consistent with the Code of Ethics, Mr. Cohen Promptly Reports His Findings to PSI Executives, Employees, the Board, and the Audit Committee.

88.     Initially upon discovering the pull-forward sales and other irregularities, Mr. Cohen grew concerned with their impacts on PSI from an operational perspective—*i.e.*, whether he, as COO, would be able to accommodate the inventory, production, and personnel demands caused by the increasingly erratic sales and revenue activity.

89.     Mr. Cohen also became increasingly alarmed by PSI's massive quarter-end revenue fluctuations during this period, because such fluctuations previously did not occur within the Company, and, as announced on PSI earning calls, PSI's revenue stream was purportedly "not cyclical."  From an operational standpoint, the pull-forward sales and related revenue spikes simply were not consistent with PSI's "level load" production model, which relied on units to be built as needed to customer specifications.

90.     Mr. Cohen reported these concerns throughout early 2016 to PSI senior executives and employees, including Winemaster, Buzogany, Kenneth Winemaster, CFO Lewis, VP of Operations Scott Christman, and VP of Sales Davis.

91.     These executives and employees failed to seriously investigate or address the issues raised by Mr. Cohen; Winemaster and others told Mr. Cohen not to concern himself with

these incidents. Meanwhile, PSI continued to make rosy, publicly disclosed financial forecasts, which were completely at odds with the Company's internal efforts to reap big sales numbers in current periods at the expense of meeting forecasts in future periods.

92.     Dissatisfied with the insufficient responses he had received, Mr. Cohen continued his independent investigation, eventually realizing that his concerns were not in fact confined to PSI's internal operations, but spread far wider—affecting the integrity of the Company's revenue, accounting, and financial reporting.

93.     Thus, pursuant to PSI's Code of Ethics and Business Conduct Code, Mr. Cohen reported these issues at the April 28, 2016 meeting of PSI's Board and Audit Committee. During Mr. Cohen's April 28 Board presentation, he presented a slide regarding pull-ahead sales and gave an extensive discussion on this topic. Mr. Cohen said multiple times "we are killing ourselves" and referred to the practice as "nonsense."

94.     In fact, Mr. Cohen consulted with Buzogany prior to the April 28 meeting to discuss his presentation. Mr. Buzogany urged Mr. Cohen not to discuss the pull-ahead sales at the Board meeting. Upon Buzogany's request, Mr. Cohen reconfigured his slide deck to make the written portion appear more palatable; he did not, however, change the focus of his oral presentation to the Board. During the April 28 presentation, working off the newly reconfigured slide, Mr. Cohen explained to the Board how the aggressive pull-forward sales practices were causing great harm to PSI.

95.     In response to his April 28 presentation, rather than providing assurances that the Board and Audit Committee would investigate these issues and commending Mr. Cohen for his reports, Mr. Cohen only received silence. The Board and Audit Committee essentially ignored Mr. Cohen's report and did not pose a single comment or question following these revelations.

22

96. Again, shocked by the Company's disregard for his reports, Mr. Cohen continued his investigation, which substantiated his broader concerns regarding financial malfeasance and fraud within PSI. Following his April 28 presentation, Mr. Cohen raised these and additional issues with Winemaster, Buzogany, and others within the Company, including to VP of Operations Christman, VP of Sales Davis, and CFO Lewis. Once again, these reports were ignored.

**B.     PSI Creates and Backdates a Bogus "Action Plan" as a Pretext to Firing Mr. Cohen in Response to His Whistleblowing.**

97. On May 2, 2016, within five days of Mr. Cohen's Board and Audit Committee report, Winemaster handed Mr. Cohen the specious "Action Plan" referenced above. When handing Mr. Cohen the Action Plan, Winemaster simply stated "the Board wanted this."

98. This supposed "Action Plan" came as a complete surprise to Mr. Cohen. Although Mr. Cohen's office is just feet from Winemaster's, this was the first time Mr. Cohen had received any complaints about his performance, formally or informally, during his four-year tenure at PSI up until that point. Moreover, although the Action Plan purportedly was dated April 27, 2016 (which on information and belief was backdated), none of these issues were raised to Mr. Cohen when he met with the Board on April 27 and 28, 2016.

99. The Action Plan claimed to list a number of vague shortcomings in Mr. Cohen's performance "over the last six months." For example, that he had "not been available during critical periods at PSI to focus on the day to day operations," "stayed at a 'high-level' without following up adequately to push initiatives and resolve issues facing [PSI]," and had not shown "strong enough" "focus and leadership as COO on the issues plaguing 3PI[.]" These "complaints" were patently false and were directly contradicted by Mr. Cohen's performance reviews; none of these issues previously had been raised to Mr. Cohen.

100.     The Action Plan also purported to place Mr. Cohen's fate in the hands of Winemaster and others on the Board, even though Winemaster was the ringleader of the fraud and malfeasance Mr. Cohen had reported in the first place.  It concluded by explicitly threatening that if "significant improvement" is not shown to these groundless and arbitrary allegations within 60 days, Mr. Cohen would face adverse employment action, including termination.

101.     Among other things, this Action Plan served as a pretext to terminate Mr. Cohen for blowing the whistle on the widespread fraud and malfeasance occurring at the Company, and a convenient means to manufacture non-existent "Cause" so as to withhold the severance and other benefits to which Mr. Cohen is entitled in the event of a non-Cause termination.

**C.     Mr. Cohen Provides Written Responses to the Action Plan that Again Place the Company on Notice of Issues Involving Fraud and Other Malfeasance.**

102.     Over the next few days, Mr. Cohen requested documents from other PSI employees and reviewed his own notes, records, and correspondence to respond to the supposed issues raised in the Board's Action Plan.

103.     On May 5, 2016, Mr. Cohen provided a point-by-point letter response to the Action Plan, supported by specific documentary evidence that refuted each of the Board's purported complaints about Mr. Cohen's job performance.  This May 5 letter again advised the Board that PSI was engaging in the foregoing, as well as other unlawful practices.  For instance, this letter plainly stated:  "The root cause of PSI's investor relation problem is that Gary [Winemaster] promotes overall aggressive sales targets, even though our head of sales, CFO and I all agree that sales guidance should be a more realistic number.  During the Board meeting we discussed the damage done to operations by stuffing the channel at the end of each quarter to make an artificial sales target."

104.     The Board failed to respond to Mr. Cohen's May 5, 2016 letter.  On May 12, 2016, Mr. Cohen emailed the Board requesting a substantive response to his May 5, 2016 letter and a meeting with Winemaster.

105.     On May 13, 2016, Mr. Cohen received a letter from Buzogany—whom the Board purportedly asked to respond on its behalf—that failed to substantively respond to the points raised in Mr. Cohen's May 5 letter, and directed him to comply with the Board's pretextual Action Plan.  This May 13 letter claimed that, suddenly, within days of Mr. Cohen reporting serious financial wrongdoing to PSI's Board, "the Board has lost confidence in [Cohen] as a leader" and "need[s] [him] to formulate projects/objectives with quantifiable monthly result oriented goals including objectives on gaining the confidence of PSI leadership and employees."

106.     Mr. Cohen was astonished by PSI and the Board's continued disregard for the serious issues that he had raised before, during and after the April 28 Board meeting—and the assertion that *he*, not the wrongdoers within the Company, was the problem.

107.     In response, Mr. Cohen prepared another detailed letter to the Board, which he first shared with Buzogany on Friday, May 13, 2016.  This letter stated that the Board has "wholly ignore[d] and fail[ed] to respond to the facts detailed in [Cohen's] May 5, 2016 memo," describing the channel-stuffing and related harms occurring at PSI.  The May 13 letter then described "details and documents supporting more than a dozen instances" showing "unethical and unlawful activities engaged in at PSI[.]"  Mr. Cohen's letter called these practices "intolerable" and described how PSI had terminated Mr. Cohen from his position as COO as of May 16, 2016 as a result of the pretextual Action Plan.  Mr. Cohen's May 13 letter further demanded that he be compensated pursuant to his Employment Agreement, SAR Agreement (as amended), and Bonus Agreement with PSI.

25

108.    Buzogany urged Mr. Cohen not to present his letter to the Board that Friday, May13, but instead to wait until the following Monday to discuss these issues with Winemaster.

**D.    PSI Terminates Mr. Cohen, Insisting Over His Objections That He Had "Resigned."**

109.    PSI's pretextual and contrived Action Plan, coupled with PSI's non-responsive and bad-faith follow-ups—and the Board and Audit Committee's outright failure to acknowledge Mr. Cohen's reports—and the fact that his boss, Winemaster, was at the center of these allegations, sent Mr. Cohen a clear and unequivocal message. He had two equally intolerable options: (a) await impending termination per the spurious Action Plan, or (b) stay with a company committing fraud further risking his reputation and harming shareholders.

110.    On the morning of Monday, May 16, 2016, Mr. Cohen met with Winemaster in person and discussed with him the contents of the letter he had shared with Buzogany on May 13, the previous business day. On information and belief, prior to this May 16 meeting, Winemaster was aware of the May 13 letter and the fact that Mr. Cohen still intended to share it with the Board.

111.    At first, Winemaster agreed with Mr. Cohen's letter that he was in fact being forced out, telling Mr. Cohen to leave PSI immediately. Buzogany was then brought into the meeting, and in an about-face, Winemaster disingenuously began referring to Mr. Cohen's termination as a "resignation," despite Mr. Cohen repeatedly stating that, in no uncertain terms, he had been terminated and that he did not, and would not, voluntarily resign from PSI.

112.    On information and belief, Winemaster and Buzogany terminated Mr. Cohen that day, May 16, 2016—one business day after he had initially shared the May 13 letter with Buzogany—in order to prevent or hinder his submission of this letter to the Board, among other reasons.

26

113.    To this end, immediately following their meeting, on May 16, Winemaster and Buzogany had Mr. Cohen's phone seized, his mobile number and contacts held hostage, and his computer access turned off.  They then told Mr. Cohen to pack up his personal items, and Buzogany escorted him out of the building.

114.    Despite having been terminated from the Company, in order to protect PSI shareholders and hold the Company accountable, Mr. Cohen next sent the Board the May 13 letter he previously had shared and discussed with Buzogany and Winemaster.

115.    The next correspondence Mr. Cohen received about his reporting efforts was a threatening letter from PSI's outside counsel, dated May 25, 2016.

116.    To date, Mr. Cohen has not been paid the amounts due under his Employment Agreement, Bonus Agreement, and SAR Agreement, as amended.

**E.      PSI Conceals Mr. Cohen's Reports and Defames Him After His Termination.**

117.    Although Mr. Cohen repeatedly insisted that he was not resigning, following his termination, PSI circulated a "Q&A" document falsely claiming Mr. Cohen had "resigned" of his own accord and insinuating that he was an ineffective COO.  On information and belief, the Company then held multiple "town hall" meetings reiterating these falsehoods to employees.

118.    Further, the day after Mr. Cohen's termination, PSI issued a misleading public press release that merely announced, without explanation, that Mr. Cohen "has left the Company."[10]  PSI unilaterally issued this release despite the fact that Buzogany assured Mr. Cohen that PSI would issue a joint, mutually agreed-upon press release with him.

---

[10] *See* https://globenewswire.com/news-release/2016/05/17/840834/0/en/PSI-Announces-Executive-Management-Changes.html

119. Likewise, on information and belief, within a few days of Mr. Cohen's termination, CFO Lewis told PSI analysts that Mr. Cohen had left of his own accord, and that the Company needed a COO who could focus on operations.

### F. Mr. Cohen Continues Reporting to Audit Committee Following Termination.

120. Mr. Cohen, despite being retaliated against, harassed, and mistreated by PSI, continued to report his concerns to the Company following his termination, and on November 4, 2016, he voluntarily met with counsel for PSI and the Audit Committee regarding the issues he began reporting back in March—eight months prior.

121. Remarkably, six days later, on November 10, 2016, PSI submitted a Form 12b-25 filing with the SEC, which states that the Company cannot timely file its financial statements and quarterly reports because "the Audit Committee is overseeing an independent internal review *relating to allegations made by a former employee concerning the Company's financial reporting*."[11] On information and belief, the "former employee" is Mr. Cohen, and the referenced "allegations" are those he began raising to PSI back in Q1 2016.

122. Thereafter, the Company has filed disclosures advising that, based on the Audit Committee's preliminary findings, PSI's financial statements for the second through fourth quarters of 2015, fiscal year 2015, and the first quarter of 2016 should no longer be relied upon and need to be restated. These findings were based on—and corroborate—Mr. Cohen's reports.

123. Then, in February 2017, PSI disclosed[12] that its independent auditor, RSM US LLP ("RSM"), had resigned after identifying several "reportable events" regarding financial reporting, including "material weaknesses in the Company's internal control over revenue

---

[11] https://www.sec.gov/Archives/edgar/data/1137091/000119312516765179/d149353dnt10q.htm (emphasis added).
[12] https://www.sec.gov/Archives/edgar/data/1137091/000119312517030399/d307842d8k.htm

recognition and, more broadly, in its overall control environment." RSM also stated it "can no longer rely on management representations," and recalled its previously issued audit reports for 2014 and 2015, stating that the 2014 audit report and Q1 2015 interim review could no longer be relied upon. These developments likewise were based on—and corroborate—Mr. Cohen's reports.

### G. Mr. Cohen Suffers Ongoing Ramifications from PSI's Retaliation.

124. Since initially uncovering PSI's fraud in early 2016, Mr. Cohen has suffered from extreme stress, anxiety, and suffering every day as a result of PSI's actions. While employed by PSI, he was placed in the untenable position of, on the one hand, ignoring, being complicit, or inadvertently facilitating the widespread and ongoing accounting, securities, and tax fraud at the Company; or, on the other, doing the right thing and challenging senior management at significant personal risk to his job and career trajectory within and outside the Company.

125. Thereafter, the pain and suffering caused by Mr. Cohen's unlawful termination and intolerable working conditions only intensified. Mr. Cohen remains the sole breadwinner for his household, including his wife and four children, and when terminated, he was left with no income, no severance to which he is entitled, and none of the SARs or bonuses he specifically negotiated with PSI. PSI's unceremonious termination also caused humiliation and harm to Mr. Cohen's self-esteem, especially in light of his exemplary track record.

126. To this day, Mr. Cohen has been tainted by his association with PSI. PSI's recent Form 12b-25 filings, although vague and misleading, raise the specter of accounting issues at the Company, and on information and belief, recruiters and other companies have been reticent to consider Mr. Cohen as a candidate as a result of his affiliation with PSI. Moreover, Mr. Cohen

has been named as a defendant in multiple shareholder suits against PSI, despite the fact that he was actively working to uncover the fraud giving rise to the allegations in that suit.

127.     PSI's false statements following Mr. Cohen's termination, suggesting he was an inadequate COO (when his performance reviews prove otherwise), have caused additional pain, suffering, humiliation, anxiety, and damage to his reputation and career trajectory.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violations of the Sarbanes-Oxley Act's Anti-Retaliation Provisions**
**(18 U.S.C. § 1514A)**

128.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129.     Mr. Cohen seeks relief from Defendant PSI under the Sarbanes-Oxley Act, which prohibits employers from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of any lawful act done by the employee to (i) provide information, or cause information to be provided, to the SEC and/or a person with supervisory authority over the him (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct) regarding any conduct which the employee reasonably believes constitutes a violation of 18 U.S.C. §§ 1341, 1343, 1344, or 1348, any SEC rules or regulations, or any provision of federal law relating to fraud against shareholders; or (ii) file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed with the SEC relating to a violation of 18 U.S.C. §§ 1341, 1343, 1344, or 1348, any SEC rules or regulations, or any provision of federal law relating to fraud against shareholders.  18 U.S.C. § 1514A.

130.    At all relevant times, Mr. Cohen was an employee, and PSI was his employer, and Winemaster and Buzogany were officers and agents of PSI, within the meaning of SOX.

131.    Mr. Cohen is a whistleblower who engaged in legally protected activities under SOX:

      a.    During the relevant time period, PSI was a publicly traded company with a class of securities registered under section 12 of the Exchange Act, 15 U.S.C. § 78l, and was therefore subject to the provisions of SOX.

      b.    Mr. Cohen reasonably believed that PSI and a number of its employees had engaged in, were engaging in, or were about to engage in conduct that violated GAAP, SOX, and the federal securities laws and rules thereunder, particularly provisions related to securities and accounting fraud.

      c.    Mr. Cohen disclosed his concerns in a manner required or protected by section 806 of SOX, 18 U.S.C. § 1514A(a):  he provided information and caused information to be provided to persons with supervisory authority over him, including PSI's CEO, Chief Legal Counsel, and Board.  Mr. Cohen also assisted in investigating these concerns and provided information or caused information to be provided regarding his concerns to persons working for PSI with authority to investigate, discover, or terminate misconduct, including the Audit Committee.

132.    Because Mr. Cohen engaged in these legally protected activities, Defendant PSI retaliated against him in the terms and conditions of his employment.  Specifically, PSI officers and agents threatened Mr. Cohen with termination via the specious Action Plan, and ultimately did terminate Mr. Cohen on or about May 16, 2016 after he continued to report his concerns.

31

133. As set forth above, PSI and its officers and agents, including Winemaster—who authorized Mr. Cohen's termination—and Buzogany—who participated in and implemented Winemaster's termination order—all had knowledge of Mr. Cohen's internal reporting efforts.

134. Nearly all of PSI's leadership (including Senior VP Kenneth Winemaster and VP of Sales Davis), and PSI's full Board (including Board members Winemaster, Landini, Hoffing, Hansen, and Vogt) also were aware of Mr. Cohen's internal reporting efforts.

135. Mr. Cohen was actually injured by PSI's retaliation including through loss of employment, lost past and future wages and benefits (including SARs, severance, and bonuses), emotional distress, pain and suffering, and reputational harm.

136. Mr. Cohen filed his SOX claim with the U.S. Secretary of Labor on November 11, 2016, which is greater than 180 days from the filing of this complaint. No final decision has been issued and there is no showing that such delay is due to the bad faith of Mr. Cohen.

## COUNT II
### Violations of Dodd-Frank's Anti-Retaliation Provisions
### (15 U.S.C. § 78u-6)

137. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

138. Mr. Cohen seeks relief from Defendant PSI under section 21F of the Exchange Act, as enacted by section 922 of Dodd-Frank, which prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower in: (i) providing information to the SEC and/or a person with supervisory authority over the him (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); (ii) initiating, testifying

in, or assisting in any SEC investigation or action based upon or related to such information; or

(iii) making disclosures that are required or protected under the SOX or any other law, rule, or

regulation subject to the jurisdiction of the SEC.  15 U.S.C. § 78u-6(h)(1)(A).

139.    SEC Regulation 21F provides that, "for purposes of the anti-retaliation

protections afforded by" 15 U.S.C. § 78u-6(h)(1), an individual is a "whistleblower" if he:

(i) possesses a reasonable belief that the information he is providing relates to a possible

securities law violation (or, where applicable, to a possible violation of the provisions set forth in

section 806 of SOX, 18 U.S.C. § 1514A(a)) that has occurred, is ongoing, or is about to occur;

and (ii) provides that information in a manner described in section 21F of the Exchange Act, 15

U.S.C. § 78u-6(h)(1)(A).  17 C.F.R. § 240.21F-2(b).

140.    At all relevant times, Mr. Cohen was an employee of PSI, and PSI was his

employer within the meaning of Dodd-Frank.

141.    Mr. Cohen is a whistleblower who engaged in legally protected activities under

Dodd-Frank:

    a.    During the relevant time period, PSI was a publicly traded company with a class

        of securities registered under section 12 of the Exchange Act, 15 U.S.C § 78l, and

        was therefore subject to the provisions of SOX.

    b.    Mr. Cohen reasonably believed that PSI and a number of its employees had

        engaged in, were engaging in, or were about to engage in conduct that violated

        GAAP, SOX, and the federal securities laws and rules thereunder, particularly

        provisions related to securities and accounting fraud.

    c.    Mr. Cohen disclosed his concerns in a manner required or protected by section

        806 of SOX, 18 U.S.C. § 1514A(a):  he provided information and caused

information to be provided to persons with supervisory authority over him,

including PSI's CEO, Chief Legal Counsel, and Board. Mr. Cohen also assisted

in investigating these concerns and provided information or caused information to

be provided regarding his concerns to persons working for PSI with authority to

investigate, discover, or terminate misconduct, including the Audit Committee.

142. Because Mr. Cohen engaged in these legally protected activities, PSI retaliated against him in the terms and conditions of his employment. Specifically, PSI and its officers and agents threatened Mr. Cohen with termination via the specious Action Plan, and ultimately did terminate Mr. Cohen on or about May 16, 2016 after he continued to report his concerns.

143. As set forth above, PSI and its officers and agents, including Winemaster (who authorized Mr. Cohen's termination), and Buzogany (who participated in and implemented Winemaster's termination order), all had knowledge of Mr. Cohen's internal reporting efforts.

144. Nearly all of PSI's leadership (including Senior VP Kenneth Winemaster and VP of Sales Davis), and PSI's full Board (including Board members Winemaster, Landini, Hoffing, Hansen, and Vogt) also were aware of Mr. Cohen's internal reporting efforts.

145. Mr. Cohen was actually injured by this retaliation including through loss of employment, lost past and future wages and benefits (including SARs, severance and bonuses), emotional distress, pain and suffering, and reputational harm.

## COUNT III
### Violations of the Illinois Whistleblower Act
### (740 ILCS 174/1, *et seq.*)

146.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

147.    Mr. Cohen seeks relief from Defendant PSI under the Illinois Whistleblower Act, 740 ILCS 174/1, *et seq.*

148.    Section 20 of the Illinois Whistleblower Act provides that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation."  740 ILCS 174/20.

149.    The Act further provides that "[a]n employer may not threaten any employee with any act or omission if that act or omission would constitute retaliation against the employee under this Act."  740 ILCS 174/20.2.

150.    At all relevant times, Mr. Cohen was an employee, and Defendant was his employer within the meaning of the Illinois Whistleblower Act.

151.    The accounting fraud, securities fraud, tax fraud, and other malfeasance, perpetrated by Defendant and its agents and officers, as set forth above, resulted in violations of corresponding State and federal laws, rules, and regulations.

152.    Defendant and its agents and officers threatened Mr. Cohen with termination via its specious Action Plan as a result of Mr. Cohen engaging in protected activities, namely reporting the accounting fraud, securities fraud, tax fraud, and other malfeasance described above to PSI's Board and senior leadership and refusing to participate or otherwise be complicit in this misconduct.

153.     Defendant retaliated against Mr. Cohen and terminated him for this protected activity on or about May 16, 2016.

154.     Mr. Cohen was actually injured by Defendant's retaliation including through loss of employment, lost past and future wages and benefits (including SARs, severance, and bonuses), emotional distress, and reputational harm.

**COUNT IV**
**Retaliatory Discharge**
**(Illinois Common Law)**

155.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.     Mr. Cohen seeks relief from PSI under Illinois common law for the tort of retaliatory discharge.

157.     At all relevant times, Mr. Cohen was an employee, and PSI was his employer, for purposes of the Illinois tort of retaliatory discharge.

158.     PSI threatened Mr. Cohen with termination via its specious Action Plan as a result of Mr. Cohen engaging in protected activities, namely reporting the accounting fraud, securities fraud, tax fraud, and other malfeasance described above to PSI's Board and senior leadership and refusing to participate or otherwise be complicit in this misconduct.

159.     The Company retaliated against Mr. Cohen and terminated him for this protected activity on or about May 16, 2016.

160.     Mr. Cohen's termination was in violation of fundamental public policies of the State of Illinois, as reflected in various State and federal laws, including but not limited to: section 3.05 of the Illinois Business Corporation Act of 1983, 805 ILCS 5/3.05 (requiring corporations to engage in "lawful" business); section 12 of the Illinois Securities Law of 1953,

36

815 ILCS 5/12 (securities fraud unlawful); section 20.01 of the Illinois Public Accounting Act,

225 ILCS 450/20.01 (accounting fraud unlawful); section 1002 of the Illinois Income Tax Act,

35 ILCS 5/1002 (tax fraud unlawful); section 20 of the Illinois Whistleblower Act, 740 ILCS

174/20 (providing whistleblower protection for employees who refuse to participate in unlawful

activities); section 806 of SOX, 18 U.S.C. § 1514A(a) (providing whistleblower protection for

employees of publicly traded companies); section 992 of Dodd-Frank, codified under section

21F of the Exchange Act, 15 U.S.C. § 78u-6 (providing securities whistleblower incentives and

protection); section 7623 of the Internal Revenue Code, 26 U.S.C. § 7623 (providing tax

whistleblower awards); and the federal securities laws and rules thereunder, particularly

provisions related to accounting and securities fraud.  Plaintiff expressly reserves the right to rely

on and assert other statutes or sources that reflect the public policies on which this claim is

based.

161.    As set forth above, PSI's actions were willful, fraudulent, malicious, oppressive,

and aggravated, and were committed with the wrongful intent to injure Mr. Cohen.

Alternatively, PSI's actions were committed with such gross negligence as to indicate a wanton

disregard of Cohen's rights.  Mr. Cohen is therefore entitled to an award of punitive damages.

162.    Mr. Cohen was indeed injured by PSI's retaliation including through loss of

employment, lost past and future wages and benefits (including SARs, severance, and bonuses),

emotional distress, pain and suffering, and reputational harm.

<u>COUNT V</u>
**Fraudulent Inducement**
**(Illinois Common Law)**

163.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

164.     As set forth above, PSI falsely and continuously represented to Mr. Cohen during his recruitment and throughout his period of employment that the Company was in a strong financial position, with sufficient internal controls and a culture of compliance.

165.     Winemaster and the other senior PSI executives who made these statements knew that they were false.

166.     Winemaster and the other senior PSI executives made these statements with the intent to induce Mr. Cohen to accept employment with PSI; to sign the Employment Agreement, the SAR Agreement, the 2015 SAR Agreement amendments, and the Bonus Agreement; and to continue working for PSI over several years.

167.     Relying on the truth of these statements, Mr. Cohen in fact accepted employment with PSI; signed the Employment Agreement, the SAR Agreement, the 2015 SAR Agreement amendments, and the Bonus Agreement; and continued working for PSI for several years.

168.     Had Mr. Cohen known the true state of affairs—including PSI's ongoing fraud, artificially inflated financial position, abysmal corporate governance, and brazen disregard for the applicable whistleblower protection laws—he would not have considered joining PSI (let alone accepting PSI's offer of employment), nor would he have continued his employment with PSI, nor would he have signed the agreements with PSI.

169.     PSI's fraudulent inducement thereby resulted in damages to Mr. Cohen including, but not limited to, loss of employment, lost past and future wages and benefits (including SARs, severance, and bonuses), emotional distress, pain and suffering, and reputational harm.

170.     As set forth above, PSI's actions were willful, fraudulent, malicious, oppressive, and aggravated, and were committed with the wrongful intent to injure Cohen.  Alternatively, PSI's actions were committed with such gross negligence as to indicate a wanton disregard of Mr. Cohen's rights.  Mr. Cohen is therefore entitled to an award of punitive damages.

## COUNT VI
### Breach of Employment Agreement
### (Illinois Common Law)

171.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

172.     Mr. Cohen's Employment Agreement is a valid and enforceable contract.

173.     Mr. Cohen performed all material obligations required of him under the Employment Agreement.

174.     PSI terminated Mr. Cohen from its employment on or about May 16, 2016 without "Cause," as that term is defined in the Employment Agreement.

175.     Pursuant to Section 4(b)(iii) of the Employment Agreement, Mr. Cohen is thus entitled to Severance Benefits, including:  (a) $500,000—Mr. Cohen's Base Salary at the time of termination; and (b) $75,068.49—an amount equal to the Annual Bonus Mr. Cohen earned in 2014[13] ($200,000), prorated for the number of calendar days Mr. Cohen was employed in 2016 (137 days).

---

[13] 2015 bonuses were delayed and withheld due to the cash shortage at the Company caused by Winemaster's and others' fraud and malfeasance.

176.     PSI breached the Employment Agreement because it failed and refused to provide Mr. Cohen with all of the rights, benefits, and payments to which he is entitled under that Agreement.

177.     PSI's breach of the Employment Agreement thereby resulted in damages to Mr. Cohen of at least $575,068.49.

**COUNT VII**
**Breach of Amended SAR Agreement**
**(Illinois Common Law)**

178.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

179.     Mr. Cohen's SAR Agreement, as amended, is a valid and enforceable contract.

180.     Mr. Cohen performed all material obligations required of him under the amended SAR Agreement.

181.     PSI terminated Mr. Cohen from its employment on or about May 16, 2016 without "Cause," as that term is defined in the amended SAR Agreement.

182.     Pursuant to the SAR Agreement amendments effectuated by Section 1(b) of the Bonus Agreement, Mr. Cohen is thus entitled to the immediate vesting of 181,290 SARs and an additional 30 days after judgment is entered to allow him to exercise such SARs.  As part of the amendment, Cohen also agreed to not sell, within the next few years, his additional approximately 60,000 SARs, which already had vested.

183.     PSI breached the amended SAR Agreement because it failed and refused to provide Mr. Cohen with all of the rights, benefits, and payments to which he is entitled under that Agreement.

184.    PSI's breach of the amended SAR Agreement thereby resulted in damages to Mr. Cohen of at least $7.3 million.

## COUNT VIII
### Breach of Bonus Agreement
### (Illinois Common Law)

185.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

186.    Mr. Cohen's Bonus Agreement is a valid and enforceable contract.

187.    Mr. Cohen performed all material obligations required of him under the Bonus Agreement.

188.    PSI terminated Mr. Cohen from its employment on or about May 16, 2016 without "Cause," as that term is defined in the Bonus Agreement.

189.    Pursuant to Section 2(b) of the Bonus Agreement, Mr. Cohen is thus entitled to an Annual Bonus payment of $250,000, representing his Annual Bonus for calendar year 2016.

190.    PSI breached the Bonus Agreement because it failed and refused to provide Mr. Cohen with all of the rights, benefits, and payments to which he is entitled under that Agreement.

191.    PSI's breach of the Bonus Agreement thereby resulted in damages to Mr. Cohen of at least $250,000.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment and relief as set forth below against Defendant Power Solutions International, Inc.:

1.    Compensatory damages, including but not limited to those for:  lost past and future wages and benefits (including SARs, severance, and bonuses), emotional distress, pain and suffering, reputational harm, and breach of contract with interest;

41

2.  Double back pay with interest;

3.  Reinstatement with the same seniority status Plaintiff would have had but for his termination, or front pay in lieu of reinstatement;

4.  An injunction ordering Defendant to cease and desist its unlawful practices with regard to retaliating against employees who raise concerns or complaints about conduct that they reasonably believe to be unlawful or fraudulent;

5.  A declaration that Plaintiff owns and is vested in 181,290 SARs at their June 2015 value when he was fraudulently induced not to exercise them;

6.  Punitive damages;

7.  Special damages under SOX;

8.  Attorneys' fees, costs, and expenses;

9.  Compensation for litigation costs and expert witness fees;

10. Interest on judgment, including prejudgment interest; and

11. Any and all other relief that this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable alleged in this Complaint or any subsequent amended complaint.

Dated:   June 9, 2017                    Respectfully submitted,

                                         **BUCKLEY SANDLER LLP**

                                         /s/ Scott Tadashi Sakiyama
                                         Scott Tadashi Sakiyama
                                         353 N. Clark Street, Suite 3600
                                         Chicago, IL 60654
                                         Telephone:  (312) 924-9893
                                         ssakiyama@buckleysandler.com

Christopher F. Regan*
Thomas A. Sporkin*
Timothy J. Coley*
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: (202) 349-8000
cregan@buckleysandler.com
tsporkin@buckleysandler.com
tcoley@buckleysandler.com

*Counsel for Plaintiff Eric A. Cohen*

*Pro hac vice* motions forthcoming